THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.*
RAMÓN R. SANTOS VÁZQUEZ, Defendant and Appellant.

No. CR-63-32.    Decided September 30, 1963.

*Carlos Sotomayor Rodríguez* for appellant. *J. B. Fernández Ba-*
*dillo, Solicitor General,* and *Américo Serra, Assistant Solici-*
*tor General,* for The People.

Division composed of Mr. Justice Pérez Pimentel, as Chief
Judge of Division, Mr. Justice Rigau, and Mr. Justice Dávila.

PER CURIAM: The prosecuting attorney filed an informa-
tion against Ramón R. Santos Vázquez, for a violation of
§ 5-801 of the Vehicle and Traffic Law of Puerto Rico,

9 L.P.R.A. § 1041, in that on June 10, 1961 he was driving a motor vehicle under the influence of intoxicating liquor. The trial having been held, he was found guilty and sentenced to serve twelve days in jail and his driver's license was suspended for a term of one year, pursuant to the provisions of the Act, 9 L.P.R.A. § 1042(a) and (d). On appeal, the appellant assigns five errors.

■ First and fifth errors: Both are directed to question the sufficiency of the evidence presented at the trial. In the first assignment it is alleged that the Superior Court erred in concluding that the defendant was intoxicated when driving his automobile and in the fifth error it is alleged that the court erred in not granting defendant the benefit of the reasonable doubt. These errors were not committed because the court had sufficient evidence to support the conviction. This case arose from a collision between the car driven by the appellant and another vehicle. In taking a curve the car driven by appellant hit another car on the left rear end. As to the condition of the appellant at that moment, the following is part of the evidence which was presented before the court:

"Q. What happened after the accident?
A. After the accident I got out of the car and I went to tell him to come to see the damages he had caused to my car.
Q. When you went to him where was he?
A. He was still in his car.
Q. Where was he sitting?
A. In front of the steering wheel.
Q. In front of the steering wheel?
A. In front of the steering wheel.
Q. Was the motor running or off?
A. I cannot tell you.
Q. Did you notice something when you went near him?
A. I noticed that he was not feeling well.
Q. How did he look?
A. As if he were in a daze.

Q. Did you notice that the daze was due to something?
A. Well, I think he was intoxicated.
Q. When you talked to him how did he talk?
A. I could hardly understand what he said.
Q. Did he talk incoherently?
A. Yes.

Q. What did he do then?
A. He got out of his car and came to mine.
Q. How did he walk?
A. Not normally; he was staggering."

In addition to the foregoing see the testimony of policeman Felipe Acosta as follows:

"Q. What was your intervention with that citizen?
A. I was called to investigate an accident in which he was one of the parties. When the investigation began he himself admitted that he was one of the parties in the accident. When I interviewed him I noticed that he had a strong smell of liquor and he staggered when he walked. I invited him to have a sample of blood, urine or breath taken. He agreed and Dr. Massari at the Río Piedras Hospital took his blood smear. Then I took him to the Court of Investigations and Judge Valdivia accused him of driving while intoxicated.
Q. Do you say the doctor took the blood smear of this man? Was that in your presence?
A. Yes, sir.
Q. And when you interviewed him what did he tell you?
A. That he was one of the parties.
Q. Did he say he was driving one of the cars?
A. Yes, that he was driving one of the cars.
Q. And you say that you could notice that he was intoxicated?
A. Yes, sir."

The result of the first official blood smear was .15 percent. This is the third alternative which the act contemplates and in this case it shall be presumed that the defendant was under the influence of intoxicating liquor, 9 L.P.R.A. § 1041(b)(3). The analysis privately made by order of the defendant gave a result of .12 percent and the second official

analysis (the one that is kept to be analyzed only by direction of the court in case of discrepancy between the first official analysis and the private analysis) gave a result of .17 percent.

■ Second and third errors: In the second assignment it is argued that the court erred in not granting the request for suppression of evidence made at the trial concerning the blood smears because the request for taking blood smears was made by policeman Acosta who, it is alleged, did not have power to request it because it was a misdemeanor which was not committed in the presence of the police. The third error is a corollary of the second and it alleges that the court erred in admitting the expert testimony on the result of the blood analysis.

Defendant is not right. The Vehicle and Traffic Law provides that it is illegal to drive a motor vehicle while the driver is under the influence of intoxicating liquor, as that condition is defined in the act itself, 9 L.P.R.A. § 1041. Pursuant to such act, when a person drives a motor vehicle in Puerto Rico it is deemed he has given his consent to submit himself to a chemical analysis of his blood, breath or urine. The person who is required to submit to said test— to which he already gave his consent in driving the vehicle— shall have the right to elect between the blood or urine analysis and, where the necessary facilities are available, he will also be able to elect the breath analysis, 9 L.P.R.A. § 1043 (a).

Besides when a person is detained upon reasonable grounds for believing that said person was driving a vehicle under the influence of intoxicating liquor, any peace officer may require the driver to submit to a chemical analysis of blood, breath or urine, as previously stated, 9 L.P.R.A. § 1043 (b).

In the instant case, where the person is detained by reason of a collision, and he is the driver of one of the two

vehicles involved in the accident, a peace officer could rightly require the driver to submit to the analysis since the officer could have reasonable grounds to believe that said person was driving under the influence of intoxicating liquor. To this effect we have previously copied the testimony of policeman Acosta, the peace officer involved, a part of which appears on p. 11 of the Transcript of Evidence.

■ Fourth error: The appellant alleges that the court erred in determining the identity of the blood smear since said identity was not proved. This error was not committed either. "The evidence reveals clearly that the night of the accident Dr. Ferdinand Massari took defendant's blood smear; that the report was prepared and it was signed by Dr. Massari; that the sample was divided into three vials, one was given to defendant; that the doctor gave the other two vials and the report to the nurse on duty to be sent to the Health Department; that the vials were identified with number thirteen. On the other hand, the chemist from the Health Department, Olga Josefa Díaz, declared that on June 14, 1961 two vials identified with number 13 containing blood, together with a report with number thirteen and with defendant's name were received by mail in that Department and that the blood in the vials was analyzed by her." See the following parts of the transcript of evidence. Upon being examined by the Prosecuting Attorney, Dr. Massari answered as follows (pp. 18, 19):

"Q. Tell me, which of these three policemen is the one you referred to?

A. This one.

PROSECUTING ATTORNEY: The witness points out policeman Felipe Acosta, license No. 1412.

Q. What did he do when he came up to you?

A. He brought me a container and asked me to take the blood smear of this man. I proceeded to take it from the right forearm because I found that the left one was an artificial

member. I took fifteen cubic centimeters and after closing the vials one of them was given to defendant and the other two were placed in the original vial again together with the report.

Q. What identification did those vials have?

A. They had number thirteen.

Q. What did you do with those vials after you took the blood sample?

A. After placing them in the original container they were given to the nurse on duty.

Q. And what was done with them afterwards?

A. They were sent to the Department of Health."

From the testimony of Olga Josefa Díaz, chemist of the Department of Health we took the following:

"PROSECUTING ATTORNEY:

Q. Will you please tell us whether you received any sample connected with Ramón R. Santos Vázquez?

WITNESS:

A. Two vials which contained blood were received at the Department of Health, together with a report with number 13, belonging to Ramón R. Santos Vázquez.

Q. How was all that received?

A. By mail.

Q. By parcel post?

A. Yes, sir.

Q. Did you make an analysis of the content of those vials?

A. Yes. A quantitative analysis was made of one of the vials giving a result of 0.15 percent of alcohol by weight in the blood.

Q. Did you make that analysis yourself?

A. Yes, sir.

Q. Can you tell whether after that date some other analysis was made of that blood?

A. A verification analysis was done in the presence of chemist Cardona, giving a result of 0.17 percent."

On cross-examination, on questions of the defense said witness answered as follows:

"Q. Have you no proof on whether the sample you received was of Ramón R. Sánchez Vázquez?

A. I know a report came with number 13, with the name of Ramón R. Sánchez Vázquez. The blood had number 13 on it."

And at page 34 of the Transcript of Evidence the following dialogue between the defense and the witness Olga Josefa Díaz appears:

"Q. Witness, is it true or not that the vials are identified by the number and not by the name?

A. By the number.

Q. You cannot affirm that the number on the vial from which you examined the content belonged to Ramón R. Santos Vázquez?

A. Well, it belongs to report number 13, which has the name of Ramón R. Santos Vázquez.

Q. And how can you be sure that the number of the vial which you examined belongs to the report?

A. Because everything came together."

The appellant alleges that there is a discrepancy in the result of the three blood tests. Precisely for those cases the act establishes that the smear shall be divided into three portions so that the court may have available the third portion for the purposes of verification, 9 L.P.R.A. § 1043 (f). When the defense asked witness Olga Josefa Díaz to what did she attribute the difference in the results, she stated the following at page 31 of the Transcript of Evidence:

"A. Well, that depends on many factors. There may be the fact that the vial was not tight. Two vials came; one is taken. If the vial is not tight the result has to be less than in the other vial."

The expert chemist himself brought to trial by the defense gave that same explanation. Chemist Cardona, stated, at p. 47 of the Transcript of Evidence, "The discrepancy to which you are referring is that as time elapses there is volatilization of the alcohol. That is common sense. . . ." That is, that if one of the three vials which contain the three blood smears is not hermetically sealed the alcohol volatilizes and since this can possibly occur in more than one vial, in different amount, that is why frequently the

three samples do not give exactly the same result. In any event, this contingency always benefits the defendant because obviously the greater the evaporation of alcohol, the lower the percentage of the chemical analysis.

The errors assigned were not committed. The evidence of the People, being believed by the trial court, as in effect it was, fully warrants the conviction. It not having been shown that the trial court committed manifest error, prejudice or partiality, and considering the opportunity which said court had to judge the credibility of the witnesses, we will not disturb the weighing of the evidence. *People* v. *Vélez Ruiz, ante,* p. 51; *People* v. *López Rodríguez,* 88 P.R.R. 459 (1963); *People* v. *De Jesús Marrero,* 88 P.R.R. 150 (1963).

The judgment rendered in this case by the Superior Court, San Juan Part, on December 11, 1961, will be affirmed.